350

RICHARD P. VANCURA, Plaintiff-Appellee and Cross-Defendant and Cross-Appellant, v. PETER KATRIS *et al.*, Defendants-Appellants and Cross-Plaintiffs and Cross-Appellees.

First District (6th Division)    No. 1—06—2750

Opinion filed December 26, 2008.—Rehearing denied May 13, 2009.—Modified opinion filed May 15, 2009.

O'MALLEY, P.J., dissenting.

Ruth A. Bahe-Jachna and Paul A. Del Aguila, both of Greenberg Traurig, LLP, and Elliot H. Scherker, of Greenberg Traurig, P.A., both of Chicago, for appellant Kinko's.

Mitchell H. Miller, of Chicago, for appellant Peter Katris.

Martin F. Hauselman and Elizabeth Monkus, both of Hauselman, Rappin & Olswang Ltd., of Chicago, for appellee.

JUSTICE McBRIDE delivered the opinion of the court:

After a bench trial, the circuit court found defendant Kinko's, Inc. (Kinko's), liable for damages resulting from its employee's notarization of a forged signature on a mortgage assignment. Kinko's[1] seeks reversal, contending the court misconstrued section 7—102 of the Illinois Notary Public Act (5 ILCS 312/7—102 (West 1996)) (Act) regarding employer liability and further erred by imposing liability under the common law for negligent training and supervision. This is a case of first impression regarding an employer's liability under the Act for a notary's "official misconduct." 5 ILCS 312/7—102 (West 1996). Defendant Peter Katris, who stood to profit from the real estate transaction involving the forged mortgage assignment, has filed a brief in support of the statutory and common law judgments against Kinko's. Plaintiff Richard P. Vancura, whose signature was forged, cross-appeals, seeking the full amount of his court reporter and expert witness fees.

■■ ■ The following relevant facts were established through discovery and a bench trial. Portions of the Act put these facts into context. 5 ILCS 312/7—102 *et seq.* (West 1996).

"6—102. Notarial Acts. ***
***

(c) In witnessing or attesting a signature, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person *appearing before the notary* and named therein.

(d) A notary public has satisfactory evidence that a person is the person whose true signature is on a document if that person:

(1) is personally known to the notary;

(2) is identified on the oath or affirmation of a credible witness personally known to the notary; or

(3) is identified on the basis of identification documents."

(Emphasis added.) 5 ILCS 312/6—102(c), (d) (West 1996).

---

[1]Kinko's has become a subsidiary corporation of FedEx Corporation and been renamed FedEx Office.

"7—101. Liability of Notary and Surety. A notary public and the surety on the notary's bond are liable to the persons involved for all damages caused by the notary's official misconduct.

7—102. Liability of Employer of notary. The employer of a notary public is also liable to the persons involved for all damages caused by the notary's official misconduct, if:

(a) the notary public was acting within the scope of the notary's employment at the time the notary engaged in the official misconduct; and

(b) the employer consented to the notary public's official misconduct.

7—103. Cause of Damages. It is not essential to a recovery of damages that a notary's official misconduct be the only cause of the damages.

7—104. Official Misconduct Defined. The term 'official misconduct' generally means the wrongful exercise of a power or the wrongful performance of a duty and is fully defined in Section 33—3 of the Criminal Code of 1961. The term 'wrongful' as used in the definition of official misconduct means unauthorized, unlawful, abusive, negligent, reckless, or injurious." 5 ILCS 312/7—101 through 7—104 (West 1996).

Sections of the Illinois Notary Public Handbook (Handbook) are also pertinent. The Handbook is a 36-page publication of the Secretary of State which includes general information, sample forms, frequently asked questions and their answers, and the entire Act. On the handbook's opening page, the Secretary of State describes five basic rules of proper notarization, including: "1) Keep your notary seal in a safe place; 2) Do not notarize a signature unless the signer is present at the time of notarization; [and] 3) Do not lend your stamp to anyone, including your employer." The document continues:

## "GENERAL INFORMATION

\* \* \*

The purpose of notarization is to prevent fraud and forgery. The notary acts as an official and unbiased witness to the identity of the person who comes before the notary for specific purposes. This places a great deal of responsibility upon the notary.

If a document requires the administration of an oath, *the person must personally appear before the notary,* be administered the appropriate oath, and sign the document in the notary's presence. [(Emphasis added.)]

If the document requires an acknowledgment, *the person must appear before the notary* and acknowledge the document. [(Emphasis added.)]

\* \* \*

Identification—A notary public *must positively identify* the person requesting notarization. \*\*\* ([See] Sec. 6—102 [of the Illinois Notary Act].) [(Emphasis in original.)]

\* \* \*

## QUESTIONS ABOUT PERFORMING NOTARIZATIONS

\* \* \*

**How does a notary identify a signer?**

A notary has satisfactory evidence if the person (1) is personally known to the notary; (2) is identified by a credible witness personally known to the notary; or (3) is identified on the basis of identification documents. Proper identification should include a photograph and a signature on a reliable identification card, such as a driver's license.

**Must the person sign the document in my presence?**

If the document requires an oath \*\*\* then an oath or affirmation must be administered to the person, and the person must sign the document in your presence. If the document requires an acknowledgment, it is sufficient for the person to appear before you and acknowledge execution of the document. Never notarize an unsigned document. You may not take an acknowledgment because someone else assures you that the signature is genuine. You may not take an acknowledgment even when you recognize the signer's signature unless that person appears before you.

\* \* \*

## NOTARIZATION PROCEDURES/RULES

\* \* \*

**What are the most common errors or omissions made by notaries?**

(1) Failing to properly identify a person; (2) failing to administer an oath or affirmation (if required); and (3) failing to affix the notary seal.

\* \* \*

## MISCELLANEOUS QUESTIONS

**Can my employer keep my seal and certificate if I leave the company?**

No. The seal and certificate are considered the property of the notary public. Also, if you lose possession of your seal, it is recommended that you resign your commission."

Plaintiff Vancura, an experienced real estate investor, agreed to help an acquaintance, defendant Glenn S. Brown, finance the purchase

and rehabilitation of a single-family home as an investment. In November 1994, Vancura loaned $100,000 to a land trust Brown established with defendant Old Kent Bank so that Brown could purchase the real property commonly known as 321 North Prospect, Wheaton, Du Page County, Illinois, for $78,000, and hire a contractor to upgrade the residence. In return, the trust executed and tendered a $110,000 installment note which was secured by a first mortgage on the Wheaton property and Brown tendered his personal guarantee that the terms of the installment note would be performed. Brown intended to sell the rehabilitated property at a profit and satisfy the note within six months.

When the Wheaton property was ready for resale, Brown consulted with a real estate agent and listed the house for $160,000. However, no one offered to buy at that price and Brown lacked the funds to otherwise repay his debt to Vancura when the note matured in May 1995. Vancura began telephoning Brown about once a month regarding the overdue debt. Both Brown and Vancura sought advice from a fellow real estate investor and their mutual acquaintance, defendant Randall Boatwright. Boatwright toured the property with the borrower and made suggestions about how to improve its sale potential. Afterward, Boatwright went out of town to find additional investors for his new video transmission company, Multi Path Communications, and when he returned, his business partner told him that Vancura was willing to trade the Brown installment note at discount for a greater share of Multi Path Communications.[2] Boatwright told Brown about the potential trade with Vancura and said that although Brown's repayment obligation had risen to $117,333, Boatwright was willing to discount the note to $90,000. Around the same time, Vancura stopped making monthly debt collection calls to Brown, although he would later testify that he did not call Brown after December 1995 only because he was angry about the unpaid debt. Intrigued by Boatwright's offer to discount the debt, Brown asked another business acquaintance, defendant Peter Katris, to fund the $90,000 payoff, in exchange for $90,000 and 50% of the profits whenever the Wheaton property sold. Katris accepted Brown's investment proposal.

---

[2]Boatwright's business partner, Robert E. Brown, bears the same last name as defendant Glenn S. Brown, but is of no relation and was not named a party in these proceedings. To avoid confusion, we refer to Robert E. Brown as Boatwright's business partner rather than by name. Although the testimony indicates he was pivotal in forging Vancura's signature and obtaining the improper notarization, the business partner did not testify in these proceedings and the record on appeal does not explain his absence.

Brown next arranged for his attorney, Karl E. Park, to conduct a real estate closing to reflect that Boatwright was buying out Vancura's interests. Attorney Park asked that the original installment note and original mortgage be available at the closing scheduled for December 20, 1995, but only so the documents could be marked "paid in full" and "cancelled" as a courtesy to the parties. He did not consider these documents or the notations to be essential to the transaction. Rather, other documents would sufficiently reflect what transpired, including an assignment of mortgage signed by Vancura, a loan discount agreement signed by Boatwright and Brown which indicated Boatwright was accepting less than the note's face value, and a release deed signed by Boatwright which indicated he was relinquishing his mortgagee's rights to the Wheaton real property. Accordingly, attorney Park drafted these three documents. When Park testified at the bench trial about a decade later, he could not recall how the unexecuted assignment of mortgage made its way into Boatwright's hands.

Boatwright testified by way of an evidence deposition that his business partner in the Multi Path Communications deal took the assignment of mortgage to Vancura's home to get the document signed. When Boatwright and his partner met the next morning (December 20, 1995), they realized some of the papers going to the closing would have to be notarized, so they drove to a Kinko's store in a shopping center in Oak Lawn, Illinois. Boatwright's business partner never testified in these proceedings. In part because only two of the three people involved in the transaction at issue testified, and in part because of the testimony that was given, it is unclear what occurred in the store that day. Even so, it is undisputed that Vancura was not there, that Vancura never personally appeared before the notary on duty, that Vancura never signed the document assigning his interest in the $100,000 note, and that when Boatwright and his partner left the Kinko's store, they had two documents which appeared to have been notarized by Kinko's employee Gustavo Albear.

Albear was named as a defendant in these proceedings, but settled with Vancura for $30,000 prior to trial and then testified about the authenticity of the notarizations. With regard to Boatwright's signature on the release deed, Albear testified that his supporting signature as a notary and the use of his notary seal were legitimate. But as to Vancura's purported signature on the assignment of mortgage, only the notary stamp was legitimate. Albear testified that the signature in the notary section was not his own, it was not his handwriting, and he would never sign a document with his full name "Gustavo David Albear." He denied personally knowing Boatwright or Boatwright's business partner.

Albear also testified, however, that he required only one form of identification to perform a notarization and would not require that it include the person's photograph. According to Albear, the single identification document need only contain a signature. When asked whether he would notarize a signature that "matched" the signature on a Social Security card (a photoless card), Albear answered "Yes," and then the following exchange occurred:

"Q. How would you know I am actually [that person]?

A. Well, that is not my job. My job is to verify your signature based on what I have in front of me.

Q. Is it to verify *** that the signature *** on two documents match? Or is it to verify the identity of the person who signed in front of you?

A. Well, my job was to receive identification and verify based on the signature [on the document] and the signature on the identification that it was the person they said they were.

Remember, I always ask people to please affirm or swear that they were who they said. That is how I was trained to do it.

* * *

Q. Okay. Now—so in other words, just to be clear, if somebody had *** some sort of [an] official looking ID with [a] signature *** like a [S]ocial [S]ecurity card. And they could sign the signature that matched the ID, you would notarize the document?

A. We [were] told to receive identification, period. Verify it and ask to swear or affirm. When all those things were in line, *** we signed and put the [notary] stamps on them [and passed the person to the cashier]."

Albear further testified that he became a notary in 1995 at Kinko's request and attended a training class led by a Kinko's employee. The training consisted of lectures conducted over two or three days at a nearby Kinko's location (not the Oak Lawn store where Albear regularly worked) and the class was "more marketing than anything else." The Kinko's employee trained Albear to keep a spiral-bound notarization log and his notary seal in a safe place, but did not specify where they should be kept. The Oak Lawn store at the "very fast-moving intersection" of 95th Street and Cicero Avenue, was very busy, was open around-the-clock, had 5 to 12 employees on every shift, and could "easily" have as many as 300 customers on a typical day. Also, the store was "[v]ery open" and customers could "easily walk behind the counter," but the manager's office was "a little different," so Albear decided to keep his notary seal and spiral-bound logbook in the manager's desk drawer. Neither the office nor the desk was consistently locked, but if either or both were locked, Albear would have to

ask the manager or assistant manager to open them. Other employees and possibly even customers could access the office when it was unlocked. Sometimes there might be a supervisor or other employee sitting in the manager's office who could have observed or safeguarded the contents of the desk drawer, "but you don't stay in an office in the back when you have to service customers in the front." When Albear transferred from the Kinko's store in Oak Lawn to a Kinko's store in Peoria, Illinois, he gave his notary seal and logbook to the Oak Lawn manager, who accepted them. The logbook could not be located for this litigation.

Daniel A. Behnke testified that he spent about 15 years managing stores for Kinko's and was the manager of the Oak Lawn store when the notarization at issue occurred. Behnke left Kinko's employ about 10 years later and was currently working for the office supply retail chain Office Max. When Kinko's initiated notary services in mid-1994, three of Behnke's employees agreed to undergo the in-house training. He was not interested in becoming a notary himself at the time because the management position required him to be "putting out fires most of the day" and because he was not willing to take on the personal liability of a notary public. During a managers' meeting, Kinko's gave Benhke an "overview of the notary program" but no "specific training about the notarization process" nor any "specific training about how to manage a notary employee." He subsequently managed notary employees like any other employees, by which he meant that his role as a manager was to "oversee the entire operations of the store," "[a]ddress issues that had to be addressed," and "counsel team members that needed to be counseled or trained or supported." He never reviewed and was never asked to approve any notarizations that were performed at his store.

On cross-examination, Behnke said he knew the notaries stored their seals and logbooks in his office and that he consented to this practice. He considered his office to be "fairly secure" because it was "removed from the actual production floor, through one or two hallways" and was "kept locked most of the time," although it was never locked when a manager or assistant manager was on duty, which would be 8 to 12 hours of a typical 24-hour day. Any employee who wanted to go into the manager's office could, but a customer would have to get past a staff that was "trained not to let people back there," and understood they were to "meet and greet every person coming to the store and actual[ly] keep an eye on what's going on." The store performed about one notarization per month and Behnke did not consider notary services to be "any great revenue generator." Kinko's never audited the notaries' logbooks and Behnke had no recollection

of what happened to Albear's log when he transferred to Peoria. Behnke denied accepting possession of Albear's notary seal when Albear quit working for him in Oak Lawn. Behnke regularly completed employee evaluations, which were based on his own observations, quality checks, and "customer feedback, mystery shops, things like that." Behnke never watched Albear perform a notarization and admitted that he therefore had "no idea whether he complied with what was required of him in the training."

Michael L. Closen, an attorney, notary public, and expert on notary practice and notary law, testified at the trial based in part on the deposition testimony of Albear and the Kinko's employee who created and conducted Albear's notary training and an oral summary of Albear's trial testimony. He was a professor emeritus of Chicago's John Marshall Law School, had retired from actively practicing law, and was a former arbitrator on commercial cases for the American Arbitration Association and the circuit courts of Cook and Will Counties (Chicago and one of its collar counties). Professor Closen taught at the law school for 27 years and also had at least 20 years' experience teaching at the Illinois Judicial Conference. He had read and written extensively in the field of notary law and practice, including co-authoring the only textbook on notary law, writing numerous law reviews on the subject, and organizing a symposium on notary law. He received notary training at the Notary Law Institute in 1990 (18 years before the trial). He had been or was currently a member of the Notary Law Institute, the American Society of Notaries, and the National Notary Association, and each of these notary education organizations had recognized him as an expert in the field of notary law and practice. In its spring 2001 publication, the Notary Law Institute referred to Closen as " 'highly esteemed nationally for his expertise and contributions to the subject [of notary law and practice].' " In its October 2001 publication, the American Society of Notaries said he was " 'known nationally as an authority on notary issues and an expert in the field of notary law.' " In its May 1998 publication, the National Notary Association said, " 'This respected law professor has become the nation's leading legal scholar on notarization, having written or inspired numerous penetrating articles on the role of the notary public in modern American life and organized a just[-]published notary symposium of over twenty articles that will stand as a landmark of scholarship for future students of notarizations.' " Closen was on the National Notary Association's drafting committee for the Notary Public's Code of Professional Responsibility and a similar committee for the Model Notary Act of 2002.

Based primarily on the Illinois Notary Act, the Illinois Secretary of State's Notary Public Handbook, and Closen's familiarity with the Model Notary Act and sound notary practices, Closen testified that Kinko's training and supervision of Albear concerning the identification of document signers was insufficient. Furthermore, the person who gave Albear his notary training was unqualified and unfamiliar with sound notary practices. More specifically, when Albear was trained in December of 1995, there were only two prevailing views in the United States regarding the proper way to identify a document signer. One view, used by Illinois and the National Notary Association (the source of the 1984 and 2002 Model Acts), was to require two or more identification documents, one of which would need to include at least a signature, photograph, and physical description.[3] The other view was to require one identification document, which included a signature and photograph, such as a United States passport, but preferably a physical description also, such as a driver's license or official State ID card. According to Closen, the Illinois legislature signaled its adoption of the first, more stringent approach by referring to identification documents in the plural, rather than an identification document in the singular. However, Albear and his instructor both stated in their depositions that they emphasized the need for one identification document with a signature on it, and Albear, in fact, "time and again referred to his focus on just a signature on a document of identification." Albear's statements led Professor Closen to conclude that even if Albear had been handed an identification document with a photograph or physical description on it, he would have disregarded those details, because he was focused on a signature. Albear's approach would allow document fraud to occur, such as if someone wanted to present a library card or other "trifling document" with a phony signature and then execute the same signature on a document to be notarized. A document containing only a signature would be "the weakest, absolute weakest form of identification that could be used by a notary." However, a document bearing a signature, photograph, and physical description would enable the

---

[3]The Illinois statute in effect during the notarization at issue is set out above. The 1984 Model Notary Act stated, " 'Satisfactory evidence of identity' means identification of an individual based on: (i) at least 2 current documents, one issued by a federal or state government with the individual's photograph, signature, and physical description, and the other by an institution, business entity, or federal or state government with at least the individual's signature; or (ii) the oath or affirmation of a credible person who is personally known to the notary and who personally knows the individual." Model Notary Act of 1984, §1—105(11) (September 1, 1984) (Definitions).

notary to compare the signatures, as well as the person's physical presence to the documented date of birth (age), height, weight, color of eyes, etc. When the notarization at issue was executed in December of 1995, notary statutes across the country "did not spell out anything beyond simply the identification of document signers," but people familiar with sound notary practices adhered to one of the two prevailing views on how to adequately identify a signer. Professor Closen stated with a reasonable degree of certainty that Illinois law in 1995 followed the more stringent approach.[4] Moreover, Albear violated the Illinois standard of care regarding the identification of document signers because Albear would not have asked for identification cards that bore a photograph, physical description, and signature. Moreover, Albear's stated practice of relying on one nonphoto form of identification bearing just a signature violated both of the prevailing views regarding satisfactory evidence of identity.

Professor Closen also held the opinion that Kinko's training regarding the security and preservation of Albear's notary seal was insufficient, demonstrated by the fact that Albear left his seal at the Oak Lawn Kinko's store when he moved to Peoria. While the Illinois statute does not speak to maintenance, preservation, and destruction of a notary's seal, the Model Notary Act and the Illinois Secretary of State's handbook do indicate the seal is the personal property of the notary public and should be defaced or destroyed so it cannot be misused subsequently.

Albear's deposition and trial testimony and the trainer's deposition testimony also led Professor Closen to conclude Kinko's training and supervision regarding the notarization logbook it instructed Albear to keep was insufficient, as shown by Albear's practice of keeping

---

[4]The record shows that after Professor Closen was deposed, Kinko's motioned in 2003 to bar him from testifying at trial regarding his opinion of the proper interpretation of the Act, and that Kinko's renewed this argument when the trial commenced in 2005. Because statutory interpretation is a question of law, expert witness testimony is considered irrelevant to the issue. *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1058, 756 N.E.2d 866, 876 (2001) (an expert witness is not competent to give testimony amounting to statutory interpretation). The court denied the motions and assured the litigants that it was aware of its duty to interpret the statute and that, in a bench trial, the court could disregard irrelevant testimony. *Cf. Clemons v. Mechanical Devices Co.*, 292 Ill. App. 3d 242, 252-53, 684 N.E.2d 1344, 1350-51 (1997) (finding that admission of expert testimony, attorney's remarks, and judge's instruction about statute may well have confused the jury about the basis for liability and deprived the defendant of a fair trial). Kinko's has not seen the need to present this argument on appeal.

his log in a spiral-bound or three-ring binder, which would permit a page to be removed without detection, and by his failure to obtain essential details such as the person's name and address for any subsequent followup, and a signature sample for comparison. All in all, Albear's log was "quite incomplete" and it "bordered on being silly to call [it] a notary journal or logbook." The Illinois statute did not require a notary public to keep a log.

Professor Closen further testified that the trainer's lack of familiarity with sound notary practices became obvious to him as he read the trainer's deposition and that he was not surprised to find out the trainer was not a notary himself.

On cross-examination by Kinko's attorney, Professor Closen testified the Illinois statute does not affirmatively state every responsibility of a notary and every responsibility of a notary's employer. As examples, the statute did not mandate any particular training and only required a notary to read and be familiar with the statute, and it did not spell out what a notary should do with his or her seal when not sealing documents. Furthermore, the Model Notary Act of 2002, currently in effect, was about five times the length of the Model Notary Act of 1984, which was in effect in 1995, but the 2002 Model Notary Act still did not address every aspect of a notary public's job. There was no single document in existence that addressed every possibility. Professor Closen also acknowledged Kinko's was not statutorily required to have a supervisor on duty whom Albear could consult if he had "a problem doing a notarization," but Closen pointed out that Albear stated at his deposition that he never felt the need to consult the store manager about a notarization, even though, in Closen's opinion, Albear "had a number of problems *** that he didn't realize [he had]."

Al Yamnitz, who joined Kinko's training staff in early 1995 shortly before conducting Albear's notary class on June 29, 1995, testified that his background included three or four semesters at a community college and approximately 15 years in the training departments of restaurant chains such as Lucky Steer Restaurants and retailers such as apparel chain T.J. Maxx. Yamnitz was not a notary in early 1995 when he put together Kinko's notary public training by reading a printed copy of the Illinois Secretary of State's Notary Public Handbook and viewing three videotapes from the National Notary Association. After reviewing these materials, Yamnitz compiled a 15- or 16-page "notary basics" workbook for his classroom presentations. Each student got his or her own copy of the workbook and could jot notes in the book for later reference. Yamnitz would lead the group through a lecture and discussion, show a videotape, "do a debrief," and then repeat the process for the next topic. The class topics

included keeping a notarizations journal, securing the notary seal, and verifying the identity of a document signer. Yamnitz taught his students to ask for a state identification card, driver's license, or other card that had a photo, the person's height and weight, and the person's signature for comparison with the signature on the document.

On cross-examination, Yamnitz acknowledged he taught his students to rely on one form of identification, but if they were "suspicious" about the one they could ask for a second one. Kinko's did not specifically employ anyone to supervise its notary employees and did not train its store managers on how to manage or supervise notarial acts. Kinko's did not provide any notary information to the store managers unless they also happened to become notaries themselves. Kinko's did not have a policy about storing or securing notary logbooks or notary seals and Yamnitz took no steps to implement any practices within the stores. Yamnitz also acknowledged the videotapes he viewed and played for Albear's class were not specific to Illinois and contained "broad[,] national" information. He relied on his own reading of the Illinois Notary Public Handbook and did not consult with an attorney or have a notary review the workbook he authored for Kinko's employees. After compiling the workbook, Yamnitz "sent a copy of the finished program off to Kinko's corporate office, and never heard anything back from them at all." He asked Kinko's regional operations manager Bill Benson for permission to attend a notary training program in order to "see if there was something else that [Yamnitz] was missing," but the training cost $300 or $400 and Benson denied the request. Yamnitz was not familiar with the Model Notary Act and had never heard of it. He did not check to see whether his students "filled in the blanks" in their workbooks, did not collect or grade their answers, did not test their knowledge, and had no idea whether Albear subsequently adhered to his training.

Boatwright also testified about the notarizations, but he contradicted Albear's testimony by saying that his business partner was a regular customer of the Oak Lawn Kinko's (Albear denied knowing Boatwright or Boatwright's partner). Boatwright also testified that when they entered the store that day, his partner went over to "ma[k]e arrangements" with "a gentleman behind the counter" while Boatwright took various documents to a self-serve photocopy machine. (Boatwright's partner did not testify in these proceedings.) When Boatwright was finished making copies for the closing, he joined his partner at the counter and produced his driver's license and other ID, "for [his] part of the notar[ization]," and they left the store. Later that same day, Boatwent went to Park's law office for the closing.

Park testified that he conducted about 40 or 50 real estate closings per month, that all of the documents presented at this closing appeared to be in order, and that he had no reason to suspect anything inappropriate was occurring. He and Brown discussed the fact that no one brought the original note and mortgage to the closing, but "all the parties knew each other [through an investment club]" and Brown "was not on the best speaking terms with Mr. Vancura [due to the overdue debt], [so it was] decided that [they] didn't want to make the phone call to Vancura." The closing concluded with Boatwright receiving Katris' $90,000 payoff in the form of a $45,000 check made payable to Boatwright and a $45,000 check made payable to Multi Path. When Boatwright left Park's office, he cashed the first check and then delivered the cash and the second check to his partner for use in the Multi Path deal.

Within two months of the closing on December 20, 1995, Brown sold the Wheaton real estate to third parties for approximately $125,000. The proceeds were enough for Brown to pay his contractors and suppliers, pay Katris $103,000, which was a net profit of $13,000 for Katris, and take a net profit for himself of $3,500.

In February 1996, Vancura asked for Brown's help with a project due to his considerable outstanding debt. Brown, however, responded that the debt had been resolved. Vancura investigated the paper trail and filed common law claims against Brown, Old Kent Bank as trustee, Boatwright, and Katris, and a statutory claim against notary Albear for "official misconduct." Vancura subsequently amended the statutory claim against the notary to include Kinko's and further amended common law negligence allegations against Kinko's. Brown and Katris joined together to sue Boatwright for fraud and Albear and Kinko's for common law negligence.

As indicated above, Albear settled with Vancura prior to trial. After seven days of trial proceedings conducted between September 2005 and January 2006, the court determined the defendants were jointly and severally liable to Vancura for damages. Brown was found in breach of his personal guarantee of the note and therefore liable for its $110,000 face value and statutory prejudgment interest; Boatwright defaulted early in the proceedings and was found liable to Vancura for the $110,000 note and statutory prejudgment interest; Katris was found liable to Vancura for his unjust $13,000 net profit on the property's resale. In addition, the court found Kinko's liable to both Vancura and Brown for the $110,000 note and statutory prejudgment interest, and liable to Katris for the $13,000 profit. The judge imposed liability against Kinko's in favor of Vancura, Brown, and Katris on the basis of section 7—102 of the Act (5 ILCS 312/7—102 (West 1996))

and also on the basis of the common law theory of negligent supervision and training.

On appeal, Kinko's challenges both the common law and statutory judgments. Kinko's concedes Albear must have either notarized Vancura's signature on the mortgage assignment despite the fact that Vancura did not personally appear before the notary public, or Albear negligently or intentionally permitted Boatwright's business partner to apply Albear's notary seal to Vancura's signature on the mortgage assignment. Under either scenario, Albear engaged in official misconduct. Thus, the material facts regarding Albear's conduct are undisputed. Even so, Kinko's argues, the trial judge misconstrued the facts regarding Kinko's common law and statutory liability and further erred by misinterpreting the statute at issue.

Although Kinko's focuses its arguments on the statutory judgment, we begin our analysis with the common law judgment, then resolve the question regarding an employer's statutory liability for its notary's "official misconduct" (5 ILCS 312/7—102 (West 1996)), and conclude with Vancura's cross-appeal regarding litigation expenses he would like to shift to the defendants.

The trial judge's findings of fact regarding Kinko's alleged negligence are subject to reversal only if they are manifestly erroneous. *City of Chicago v. Old Colony Partners, L.P.*, 364 Ill. App. 3d 806, 812, 847 N.E.2d 565, 560 (2006) (on appeal from a bench trial, findings of fact will not be disturbed unless manifestly erroneous); *Schatz v. Abbott Laboratories, Inc.*, 51 Ill. 2d 143, 281 N.E.2d 323 (1972) (use of the manifest error standard when reviewing a bench trial is so firmly established as to require no citation to authority). Manifest error occurs when all reasonable persons would find the opposite conclusion is clearly apparent. *City of Chicago*, 364 Ill. App. 3d at 812, 847 N.E.2d at 560; Black's Law Dictionary 563 (7th ed. 1999) (manifest error is one that is plain and indisputable). See also *Board of Education, School District No. 90 v. United States Fidelity & Guaranty Co.*, 115 Ill. App. 2d 416, 425, 253 N.E.2d 663, 667 (1969) (the "manifest" weight of evidence means the " 'clearly evident, plain and indisputable' " weight of the evidence), quoting *Whitman v. Prescott*, 80 Ill. App. 2d 49, 58, 225 N.E.2d 384 (1967).

■ A claim for negligent training or supervision concerns the employer's own negligence rather than the negligence of its employee, meaning that the employer's liability is direct, not vicarious. 30 C.J.S. *Employer—Employee* §205, at 254 (2007); *Cutter v. Town of Farmington*, 126 N.H. 836, 498 A.2d 316 (1985) (distinguishing between employer's vicarious liability under the doctrine of *respondeat superior* for employee negligence and employer's direct liability for its own

negligent hiring, training, and supervision). In order to hold an employer liable for injuries resulting to third persons from negligent training or supervision of an employee, it must be established "that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, having this knowledge, failed to supervise the employee adequately, or take other action to prevent the harm." 30 C.J.S. *Employer—Employee* §205, at 255 (2007); *Kresin v. Sears, Roebuck & Co.*, 316 Ill. App. 3d 433, 441, 736 N.E.2d 171, 177 (2000) (affirming judgment against employer for negligent training and instruction where there was inherent danger in operating a motor vehicle near pedestrians, pedestrian entrance was adjacent to automotive service bay area, and employer told mechanics to be careful and use common sense when backing out vehicles but did not give instructions about specific safety precautions to use to avoid colliding with other vehicles or pedestrians). Negligence is generally defined in Illinois as "the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under [the] circumstances." Illinois Pattern Jury Instructions, Civil, No. 10.01 (3d ed. 1994). See generally *Longnecker v. Loyola University Medical Center*, 383 Ill. App. 3d 874, 885, 891 N.E.2d 954, 963 (2008) (in a common law negligence action, "a defendant hospital is judged against what a reasonably careful hospital would do under the same circumstances"). "While it is not necessary that the employer should have contemplated or been able to anticipate the particular consequences, the injury must have been a reasonably foreseeable consequence of [the] employer's negligent failure to train and supervise, and there must be a [causal] relationship between this alleged deficiency and the harm suffered." 30 C.J.S. *Employer—Employee* §205, at 255-56 (2007).

Vancura, Brown, and Katris alleged that Kinko's had a duty to the public in general and any person accepting documents notarized by Kinko's to train, supervise, and control its notary-employees to assure they were authenticating only signatures executed by properly identified persons, however, Kinko's failed to train and supervise Albear to require a photo identification card before he notarized documents. It was further alleged that Kinko's training and supervision was so lacking that Albear negligently, carelessly, or intentionally permitted his notary seal to be affixed to the assignment of mortgage even though the purported signator had not personally appeared before Albear. In addition, as a direct and proximate result of Kinko's negligent training and supervision, Vancura's note and mortgage no longer appeared enforceable and Vancura had been unable to collect the monies he was contractually entitled to, resulting in damages in the amount of

$110,000, as well as interest, court costs and attorney fees. Kinko's negligence also harmed Brown and Katris, when in reliance on an improperly notarized document, they became partners on the real property and were sued.

The trial judge relied on Professor Closen's expert opinion as to the common law standard of care for notaries and their employers, and stated in the judgment order:

"[In the professor's] expert opinion, the standard of care in this area is reasonableness. ***

It was Professor Closen's opinion that Kinko's was negligent in its training and supervision of Gustavo Albear. Professor Closen testified that he based his opinion on the fact that Kinko's asked Albear to become a notary for Kinko's. Kinko's provided notary training for Albear and other company notaries. Kinko's used an instructor who had no experience as a notary and was not familiar with Illinois notary requirements, to train its notaries. *** The notary program instructor was chosen simply because he was an instructor for Kinko's copy department, not because he had any knowledge or experience about notary practice and law. The instructor *** was not a notary at the time he trained Albear and had never been a notary. In Closen's opinion, the notary instructor did not properly train Albear and others about the procedures for identifying document signers, did not teach them that information regarding notarizations was to be kept in a [bound] journal, did not teach them about steps to take to secure the notary seals and journal, and did not instruct Kinko's notaries on the need to preserve the notary seal and logbook."

As a result:

"It was Professor Closen's opinion that Gustavo Albear was not acquainted with sound notarial practice. Albear did not require photo identification from a document signer. He did not properly secure his notary seal and he did not properly keep [the] notary journal [Kinko's instructed him to keep]. Also, Closen testified that when Albear left the employ of Kinko's, he left his seal and journal behind with no assurance that the seal would not be misused or that his logbook would not be lost or destroyed."

Further:

"The Court finds that while there is no statutory mandate requiring supervision and training of its notaries, the common law requires that Kinko's, as a provider of notary services to the public, must adhere to a standard of reasonableness regarding its notary employees. This standard would require that the notaries employed by Kinko's understand notary requirements and that they are supervised in a manner to ensure that they are performing their

duties in accordance with the law, so as to prevent harm to the public. The Court finds that the evidence supports a finding that Kinko's failed to meet the necessary standard of care, and is therefore liable for negligent training and supervision of its notary employees."

With regard to Albear's training, Kinko's now contends "the training provided by Kinko's to its notary-employees imbued its employees with their duties under Illinois law," but the judge erroneously expected Albear to be trained to a higher standard. Kinko's sets out the relevant requirements of the Act, including that "the notary public must determine, *** from satisfactory evidence, that the signature is that of the person appearing before the notary and named therein," and that the "notary public has satisfactory evidence that a person is the person whose true signature is on a document if that person *** is identified on the basis of identification documents." 5 ILCS 312/6— 102(c), (d)(3) (West 1996). Kinko's also emphasizes that despite Professor Closen's testimony regarding the inadequacy of Albear's logbook, there was no obligation under the Illinois statute to maintain a logbook. Kinko's relies on authority indicating violation of a statute may be a basis for a tort claim. See, *e.g., Calloway v. Kinkelaar,* 168 Ill. 2d 312, 659 N.E.2d 1322 (1995); *Bier v. Leanna Lakeside Property Ass'n,* 305 Ill. App. 3d 45, 711 N.E.2d 773 (1999). Kinko's concludes that since its notary training was consistent with the statute, the judge erred in finding negligence occurred. With regard to the negligent supervision finding, Kinko's cites case law regarding an entirely different type of tort, negligent hiring and retention of an unfit employee (see *Van Horne v. Muller,* 185 Ill. 2d 299, 705 N.E.2d 898 (1999); *Browne v. SCR Medical Transportation Services, Inc.,* 356 Ill. App. 3d 642, 648, 826 N.E.2d 1030, 1036 (2005)), and argues no evidence was offered indicating Albear was negligently hired and retained. The cited case law has no bearing on the judge's finding of negligence and does not warrant further discussion. More importantly, the failure to cite relevant authority is a violation of the supreme court rule concerning an appellant's brief and waives consideration of the argument. *Fortech, L.L.C. v. R.W. Dunteman Co.,* 366 Ill. App. 3d 804, 852 N.E.2d 451 (2006); 155 Ill. 2d R. 341(e)(7). See also *People v. Smith,* 228 Ill. 2d 95, 106, 885 N.E.2d 1053, 1059 (2008) (the two most important tasks of an appellate court panel are to determine whether it has jurisdiction and whether any issues have been waived). We find, therefore, that Kinko's has waived review of the imposition of liability under the common law, and we affirm that portion of the order on appeal. Kinko's is liable to Vancura, Brown, and Katris pursuant to their common law claims.

■ Waiver aside, the negligence judgment is consistent with the manifest weight of the evidence. We emphasize that Professor Closen was accepted as an expert and that his opinion regarding the standard of care and Kinko's failings was not impeached. The witness testimony and documents established that Kinko's asked Albear to become a notary, gave him in-house training, and offered his notarial services to the public, but did not adequately train and supervise. Even when we disregard the testimony indicating Albear's logbook was deficient, we still conclude Kinko's was negligent, due to its failure to train and supervise Albear in the identification of customers and the security of his notary seal. We accept Kinko's contention that it was under no statutory obligation to train its notary employees. Nevertheless, it chose to train Albear and it showed no concern for whether its instruction did actually "imbue[ ] its employees with their duties under Illinois law." Furthermore, Kinko's made no attempt to supervise Albear's notary practices and it helped him store his notary seal improperly. In order to reverse the judge's ruling that Kinko's negligently trained and supervised Albear, we would have to conclude that all reasonable persons would find the opposite conclusions are clearly apparent, which we do not. *City of Chicago*, 364 Ill. App. 3d at 812, 847 N.E.2d at 560; Black's Law Dictionary 563 (7th ed. 1999) (manifest error is one that is plain and indisputable); see also *Board of Education, School District No. 90*, 115 Ill. App. 2d at 425, 253 N.E.2d at 667 ("manifest" weight of the evidence means the " 'clearly evident, plain and indisputable' " weight of the evidence), quoting *Whitman*, 80 Ill. App. 2d at 58.

More specifically, the evidence showed a Kinko's employee developed Kinko's training program, even though he was not a notary himself and had not received any training about the proper performance of notarial tasks. The inexperienced trainer developed a course format and authored a "notary basics" workbook for his students without any oversight or feedback from a notary or an attorney versed in notary law. The trainer relied on nothing more than his own reading of the Secretary of State's handbook and viewing of three instructional videotapes from the National Notary Association.

The trainer expressed doubt about his self-instruction, told Kinko's he was "missing" material details about notary practices, and asked if he could attend a notary course, but Kinko's refused to pay the $300 or $400 fee for professional notary training, disregarded his concern, and sent store employees such as Albear to his classroom.

Even if the in-house trainer was well-versed in Illinois' notary practices, he did not effectively teach those practices to Albear. Kinko's could not support its argument about the effectiveness of its

training program by citing objective indicators such as student grades or test results, and it could show only the attendance records for Albear's training session. The trainer made no effort to confirm his students accurately completed the "notary basics" workbook which he authored and testified could be used as a reference book while on the job. He made no effort to confirm his students were comprehending the lectures and the instructional videotapes, which he could have done by collecting, reviewing, and grading the completed workbooks and administering quizzes and/or a final test of his students' comprehension. If the trainer had taken these steps, he could have remedied any material miscomprehension or disqualified a student such as Albear from working as a notary in Kinko's name. Because the trainer did not take these steps, Kinko's has nothing to document that Albear was effectively trained to follow the Illinois standards.

While the trainer testified he properly instructed Albear to adhere to Illinois's standards and Kinko's is arguing there is no dispute it "trained its notary-employees to follow the [statute] and the [guidelines set out in the Secretary of State's handbook]," the manifest weight of the evidence and Albear's account indicated otherwise. When Albear and the trainer gave conflicting testimony, it was the judge's duty to determine which person gave the more credible account of the in-house training program. *In re Marriage of Kaplan*, 149 Ill. App. 3d 23, 28, 500 N.E.2d 612, 616 (1986). "It is a well-established rule that the credibility of witnesses should be left to the trier of fact because it alone is in the position to see the witnesses, observe their demeanor, and assess the relative credibility of witnesses where there is conflicting testimony on issues of fact." *In re Marriage of Kaplan*, 149 Ill. App. 3d at 28, 500 N.E.2d at 616. "[T]he trial [judge] has a unique opportunity, which cannot be reproduced from the cold inanimate record, to observe and judge the witness' demeanor and credibility." *In re Marriage of Zirngibl*, 237 Ill. App. 3d 1049, 1054-55, 606 N.E.2d 1, 4 (1991). A reviewing court will not overturn a trial court's determinations of credibility unless they appear contrary to the manifest weight of the evidence (*In re Marriage of Zirngibl*, 237 Ill. App. 3d 1049, 606 N.E.2d 1 (1991)), which is not the case here.

Albear characterized the training program as "more marketing than anything else." Despite the trainer's testimony, the inadequacy of the program is shown by the fact that Albear left the classroom with the misapprehension that he was properly performing his notary public role if he asked customers to first "affirm or swear that they were who they said," even though there is no provision in the statute for a person to identify themselves by taking an oath. Albear's comprehension of the statute is contrary to its plain meaning. The

statute anticipates that a customer may hire a notary to witness an oath-taking[5] (as opposed to notarizing a signature), but the statute does not permit the notary to use an oath in lieu of adequate identification credentials which establish that a person seeking a notarization is indeed the person he or she claims to be. Despite the trainer's testimony, the inadequacy of the training was also demonstrated by Albear's testimony that he was trained to rely on a pictureless form of customer identification. The statute indicates the notary public "has satisfactory evidence" of the customer's identity when the customer is "identified on the basis of identification documents." 5 ILCS 312/6—102(d)(3) (West 1996). In this day and age, an adequate identification document under the circumstances is one that includes at least a photograph and signature. The 1984 and 2002 versions of the Model Notary Act spell out this minimum standard. The 1984 version described adequate identification as a current document "issued by a federal or state government with the individual's photograph, signature, and physical description" when presented along with a current document issued by "an institution, business entity, or federal or state government with at least the individual's signature." Model Notary Act of 1984 §1—105(11) (September 1, 1984) (the 1984 document expressly required multiple forms of identification). The 2002 version, which the notary expert indicated was a more detailed description of sound notary practices, explained:

> "[This subsection] describes the duty of care which the notarial officer must exercise in identifying the person who makes the acknowledgment, verification, or other underlying act. California law, for example, provides an exclusive list of identification documents on which the notarial officer may rely. These are documents containing pictorial identification and signature, such as local drivers' licenses, and U.S. passports and military identification papers, issued by authorities known to exercise care in identification of persons requesting such documentation." Model Notary Act of 2002, §2—f, app. 2, Commissioners' Comment, at 104.

---

[5] See 5 ILCS 312/6—101(b), (c) (West 1996) (definitions of "acknowledgment" and "verification upon oath or affirmation"), which contain the statute's only references to oaths or affirmations. The examples in the Illinois Notary Public Handbook indicate that in some instances a notary public will be asked to administer an oath such as " 'Do You Swear (Or Affirm) That The Statements In This Document Are True,' " and on rare occasions to administer an verbal oath or affirmation to a public official taking office, such as " 'I do solemnly swear (affirm) that I will support the Constitution of the United States, and the Constitution of the State of Illinois, and that I will faithfully discharge the duties of the office of _____ to the best of my ability.' " These are the only examples of oaths or affirmations appearing in the handbook.

See also Cal. Civ. Code §1185 (Deering 2005) (indicating satisfactory evidence of identity may be found in a local driver's license or United States passport, or in some instances in a foreign government's passport, foreign driver's license or other state identification card, military identification card, or inmate identification card). The model acts and their official comments are not expressly incorporated into the Illinois statute, but it is a common and sound practice in this jurisdiction to consult this type of persuasive authority to define statutory terms. See *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 164, 862 N.E.2d 985, 992 (2007) (relying on Restatement (Second) of Agency to define a key statutory term); *Lohr v. Havens*, 377 Ill. App. 3d 233, 879 N.E.2d 386 (2007) (relying on Model Business Corporation Act's historical background and comments sections to define a crucial statutory term); *Haseman v. White*, 177 Ill. 2d 414, 686 N.E.2d 571 (1997) (relying on foreign case law only after confirming that neither Illinois act nor Model Property and Casualty Post-Assessment Guaranty Association Act defined a dispositive statutory term). We consider the 2002 version of the model statute particularly pertinent here because it was drafted by a committee of 29 individuals well-versed in the realities of a notary's job, including secretaries of state, recorders of deeds, and attorneys general, or members of their staff; representatives of land title companies, a surety corporation, and law professors, including the one who testified in this matter. Model Notary Act Drafting Commission, Model Notary Act of 2002, http://www.nationalnotary.org (last visited December 15, 2008). Thus, if we had any reason to doubt the notary expert's uncontradicted testimony that a pictureless identification card was a "trifling" form of identification, which we do not, the model acts would dispel that concern. We also note that written training materials that were reviewed or prepared by someone with notary law expertise, such as the drafters of the model acts, could have instilled this minimum standard in Kinko's employees.

The inadequacy of the training is also shown by the fact that Albear learned his role was not to confirm the identity of the *person* appearing before him, as the statute requires, but to confirm that the signature on the identification document that was offered "matched" the signature on the document that was to be notarized. After reading Albear's deposition transcript, the notary expert pointed out that if Albear had been handed a driver's license with a photograph and physical description, Albear would have disregarded those details because he was focused exclusively on matching the signatures on the license and the document to be notarized.

Thus, the record gives multiple indications that Albear learned to routinely notarize documents without adequately identifying the purported signer, in that it shows Albear would depend on persons to swear they were who they said they were, Albear would accept a pictureless identification document, and Albear used the identification document merely as a signature exemplar instead of to confirm the person's identity. Kinko's knew or should have known that Albear's failure to positively identify persons requesting notarizations through pictorial identification and signature documents such as local drivers' licenses would, sooner or later, permit fraud or forgery to occur. When the purpose of notarization is to prevent fraud and forgery, adequate identification involves more than accepting a customer's personal statement and signature exemplar.[6]

Furthermore, the trial evidence established that Albear left Kinko's training class believing he did not need to retain control of his personal notary seal and could leave it unattended on the store premises. Albear testified that he routinely left the seal in the store manager's desk drawer, even when Albear was not at the store himself, even though the desk drawer was inconsistently locked, and even though the manager's office was usually unattended because the 24-hour store was very busy and staff could not "stay in an office in the back when [they were needed] to service customers in the front." The Oak Lawn store manager was aware of and approved of this improper storage practice which would permit other employees or even customers to gain access to Albear's personal notary stamp.

The store manager's misjudgment may have occurred because Kinko's did not instruct Albear's supervisors about sound notarial practices or how to supervise an employee to ensure he or she was adhering to the basic rules of proper notarization. Kinko's made no attempt to supervise Albear's on-the-job conduct, either on a routine basis or through random auditing of the logbook it instructed him to

---

[6]We do not need to resolve whether the common law and the Illinois legislature required notaries such as Albear to insist on multiple forms of identification as Professor Closen testified (see above regarding the "two prevailing views" and the 1984 Model Act's express reference to "at least two current documents"). Albear testified he operated below both the common law and statutory standards when he stated his practice was to rely on a pictureless form of identification and to focus on matching the signatures rather than confirming the person's identity. The question of whether he was further violating the common law and the statute by accepting one rather than at least two ID cards is not essential to the disposition of this case. Accordingly, we express no opinion as to whether Illinois adopted the more stringent approach as Professor Closen testified.

maintain or spot checking of his actual practices (manager Behnke testified "mystery shops" were used to evaluate employee performance of other tasks). Given Kinko's failure to communicate any standards to its supervisory staff, it was foreseeable that the store manager and assistant manager failed to supervise Albear's conduct, allowed him to improperly leave his notary seal where it was accessible to other people, and improperly accepted possession of his personal notary seal when he quit working at the Oak Lawn store. The judge found Kinko's supervision was lacking because "Kinko's managers were not trained in the responsibilities of notaries," and the record provides no basis for rejecting this finding. We agree that a reasonably careful employer would have ensured that supervisory personnel at the Oak Lawn store understood Albear's responsibilities such that they never took possession of his seal at the 24-hour store, that they provided a secure storage place that only Albear could access, and that they refused possession of the seal on a permanent basis when Albear transferred to a Peoria store. Kinko's exercised no supervision and could not be considered "reasonably careful."

Thus, the manifest weight of the evidence indicates Kinko's had no regard for whether Albear understood his responsibilities and adhered to them. This is negligence. Kinko's permitted Albear to notarize documents on its behalf simply because he had shown up for an in-house class and was willing to get his notary credentials. The evidence shows Kinko's was wilfully, consistently ignorant of whether its employee understood what he was supposed to do and did it. A reasonably careful employer would have confirmed the training class it voluntarily created conveyed what Albear needed to know, before he began validating legal documents such as the assignment of mortgage at issue which enabled defendant Boatwright and his business partner to improperly gain control of plaintiff Vancura's mortgage interests. A reasonably careful employer would have confirmed its notary employee worked within the common law standards. By failing to effectively teach Albear about sound notarial practices and supervise his work, Kinko's effectively put a notary seal into the hands of anyone at the Oak Lawn store who wanted to use it. We do not believe the impropriety at issue would have occurred on December 20, 1995, if Kinko's had provided either adequate training in June 1995 or adequate supervision between June and December 1995. The evidence shows the improper notarization at issue occurred either because Albear himself affixed his notary seal to the forged assignment of mortgage assignment without adequately identifying the person appearing before him or he carelessly or consciously allowed someone else to affix the seal. Albear's unsound but continuous practice of ac-

cepting an oath and pictureless identification document, and to focus exclusively on the signatures, as he was trained, would have permitted someone to impersonate Vancura without much effort. Albear's mishandling of his notary seal, as he was trained and with the ongoing knowledge and approval of his store manager, made the seal accessible to unscrupulous customers or coworkers who had less regard for notary standards than Albear and were willing to misuse the seal for profit or as a favor to a regular customer of the store. Furthermore, Albear may have been willing, in a work environment where his employer treated notarizations so casually, to intentionally allow Boatwright or Boatwright's business partner to misuse the notary seal. Kinko's negligent training and supervision permitted whatever occurred at its Oak Lawn store on December 20, 1995, when defendant Boatwright and his business partner arrived without plaintiff Vancura and departed the store with what appeared to be a valid notarization of Vancura's forged signature on the assignment of mortgage.

Therefore, if Kinko's had not waived review of the common law judgments by presenting an inadequate brief, we would nonetheless conclude the manifest weight of the evidence supports the judge's findings of fact and conclusion that Kinko's training and supervision were negligent.

■ Our second main consideration on appeal is whether the statutory judgments were properly entered. Kinko's contends that the evidence fell short of satisfying subparagraphs (a) and (b) of the statute regarding employer liability for a notary's misconduct (5 ILCS 312/7—102 (West 1996)) and that the judge further erred in interpreting the statutory language. Again, employer liability arises under subparagraph (a) of section 7—102 of the notary statute only when the notary was "acting within the scope of the notary's employment at the time [he] engaged in official misconduct" (5 ILCS 312/7—102(a) (West 1996)) and subparagraph (b) of the employer liability requires the employer to have "consented to the notary public's official misconduct" (5 ILCS 312/7—102(b) (West 1996)). Because we conclude the issue of consent is dispositive of the statutory judgments, we proceed directly to that issue without discussion of whether Albear was acting within the scope of his employment when Vancura's forged signature was notarized.

Arguments regarding the trial evidence and statutory interpretation implicate two legal principles. The first principle, stated above, is that findings of fact and determinations of credibility will not be disturbed unless they are contrary to the manifest weight of the evidence, which occurs only where all reasonable persons would find the opposite conclusions clearly apparent. *City of Chicago,* 364 Ill.

App. 3d at 812, 847 N.E.2d at 560; *In re Marriage of Zirngibl*, 237 Ill. App. 3d at 1054-55, 606 N.E.2d at 4. The second relevant principle is that the interpretation of the statutory language is reviewed under the nondeferential *de novo* standard. *City of Chicago*, 364 Ill. App. 3d at 812, 847 N.E.2d at 560; *People v. A Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 841 N.E.2d 928 (2005). Our role is to ascertain and give effect to the intent of the legislature in adopting the statute. *City of Chicago*, 364 Ill. App. 3d at 813, 847 N.E.2d at 561. Legislative intent is put into effect when we construe the statute as a whole, giving each word, clause or sentence its reasonable and ordinary meaning. *City of Chicago*, 364 Ill. App. 3d at 813, 847 N.E.2d at 561.

Kinko's argues "consent" in this context means it must have asked or encouraged Albear to act improperly or it must have tolerated a previous pattern of intentional or negligent misconduct by Albear or other notary employees and failed to correct this behavior through training or supervision. Kinko's bases this argument in part on *Commercial Union Insurance Co. of New York v. Burt Thomas-Aitken Construction Co.*, 49 N.J. 389, 395, 230 A.2d 498, 501 (1967), a New Jersey case in which the court refused to impose vicarious liability for a notarized forged signature on an indemnity agreement, because the employee was a bank cashier who also notarized documents as a courtesy to the bank's customers but not as a function of his employment. The New Jersey court could "see no good reason to hold [liable] a private employer who was in no sense a party in interest in the transaction." *Commercial Union*, 49 N.J. at 395, 230 A.2d at 501. Kinko's relies on the court's additional remark: "We add that the private employer of a notary public might be liable for the notary's breach of duty if the employer participated in that breach, as for example if the employer should ask or encourage the notary to act without appropriate inquiry." *Commercial Union*, 49 N.J. at 395, 230 A.2d at 501. Kinko's contends there is no evidence it participated in the improper notarization at issue by asking or encouraging Albear to affix his notary seal without appropriate inquiry into the identity of the person who presented Vancura's assignment of mortgage for notarization. Kinko's also bases its lack-of-consent argument on comments in the National Notary Association's Model Notary Act of 2002. As we indicated above in conjunction with Albear's reliance on a pictureless identification document, consideration of persuasive authority to define a statutory term is a sound approach often used in this jurisdiction.

In the comment section regarding employer "consent," the panel of state notary officials and legal experts distinguished between "ac-

tive consent" to official misconduct, such as when the employer directs, encourages, expects, or tolerates the notary's misconduct, or "implied consent," such as when the employer knows of at least one previous similar transaction but fails to address it. More specifically, the comment to section 12—1 of the Model Notary Act of 2002 states in pertinent part:

"Active consent includes directing, approving or tolerating the notary's behavior. For these purposes, 'tolerating' is the functional equivalent of tacit approval. It connotes an awareness of the behavior without taking any steps to correct or prevent it from recurring. Additionally, encouraging or expecting an employee-notary to perform improper notarial acts will constitute active 'consent.' The facts of each particular case will have to be reviewed to ascertain when the employer encouraged the notary to perform an improper notarization. The same is true for those cases in which the injured party will try to demonstrate how the employer 'expected' the behavior.

As to implied 'consent,' the [Model Notary Act of 2002] simply provides that any past action or inaction by the employer concerning a particular improper notarization will carry forward to a later improper notarization. The theory is that an employee may reasonably rely on the employer's past action (or inaction, as the case may be) as a guide to a present act. If objection were not raised earlier, there is no reason to believe it would be raised now. Thus, under the implied 'consent' rule, an employer may be liable for a notarization despite being totally unaware it was performed by the employee-notary. The employer's failure to properly address a prior improper notarization can provide the basis for liability resulting from a future improper notarization.

The implied 'consent' rule can be applied to an improper notarization by any of an employer's notaries. It is not limited to only the future improper notarizations of the notary who performed a prior improper notarization. The theory justifying the broad application of the [employer liability] rule is that employees are charged with knowledge of company policies and normally are aware of the acts of similar coworkers. It would be inappropriate to allow an employer to escape responsibility because a different employee-notary relying on past company practice performed the improper act. [This model act] effectively imposes an affirmative obligation on employers to promulgate and implement adequate internal controls to ensure that employee-notarizations perform properly." Model Notary Act of 2002, §12—1, Liability of Notary, Surety, and Employer, Comment, at 68-69.

Thus, "active consent" requires an awareness of the wrongful transaction at issue. Kinko's, however, was not affirmatively involved in the notarization of Vancura's forged signature. There is no testimony or written evidence indicating Kinko's directed, approved, tolerated, encouraged, or expected Albear to act as he did on December 20, 1995, when Boatwright and Boatwright's business partner sought notarization of Vancura's signature even though Vancura was not present. Model Notary Act of 2002, §12—1, Liability of Notary, Surety, and Employer, Comment, at 68-69. The transaction depicted in *Transamerica Insurance Co. v. Valley National Bank of Arizona*, 11 Ariz. App. 121, 462 P.2d 814 (1969), appears to be what the model act's drafters were contemplating by "active consent." The notary in that case was a Mesa, Arizona, bank manager's secretary who had obtained her notary credentials and surety bond at the urging and expense of the financial institution. *Transamerica*, 11 Ariz. App. at 122, 462 P.2d at 815. Testimony established that over the course of about a decade, her superiors asked her numerous times to notarize signatures without seeing the person sign the document in question, provided the document involved a bank transaction and the signator was a customer with a signature card on file at the branch office. *Transamerica*, 11 Ariz. App. at 122, 126, 462 P.2d at 815, 819. The secretary also furnished her notary services to bank customers on nonbank business, but there was conflicting testimony as to whether her superiors instructed her to rely on a customer's signature card under those circumstances. *Transamerica*, 11 Ariz. App. at 122, 126, 462 P.2d at 815, 819. One of the bank's customers brought in a warranty deed purporting to transfer ownership of some farmland (nonbank business) which he said had been signed by another customer of the bank, and he asked the secretary to notarize the signature. *Transamerica*, 11 Ariz. App. at 122, 462 P.2d at 815; *State of Arizona v. Singh*, 4 Ariz. App. 273, 275, 419 P.2d 403, 405 (1966). She did so after comparing the signature kept on file with the signature on the warranty deed, and he used the document to sell the land and collect $84,800 from an escrow agent. *Transamerica*, 11 Ariz. App. at 122, 462 P.2d at 815; *Singh*, 4 Ariz. App. at 275, 419 P.2d at 405. The signatures on the warranty deed and other documents in escrow were actually tracings, and after the scheme unraveled, criminal charges for forgery were brought against the perpetrator, as well as a civil suit against the bank to regain the escrow money. *Transamerica*, 11 Ariz. App. 121, 462 P.2d 814; *Singh*, 4 Ariz. App. 273, 419 P.2d 403. In the civil proceedings, the trial court entered summary judgment for the bank, but was reversed on appeal, due in part to the conflicting testimony as to whether the bank expected its

employee to notarize documents in a nonbank transaction. *Transamerica*, 11 Ariz. App. at 125, 462 P.2d at 818. The appellate court cited the New Jersey case Kinko's has brought to our attention, *Commercial Union*, as support for its determination the Arizona bank could be held liable if it had asked or encouraged its employee's misconduct. *Transamerica*, 11 Ariz. App. at 126, 462 P.2d at 819, citing *Commercial Union*, 49 N.J. at 395, 230 A.2d at 501. See also *Lisi v. Resmini*, 603 A.2d 321 (R.I. 1992) (attorney disciplinary proceedings in which counsel was suspended for one year because on three different occasions he signed the names of clients to answers to interrogatories and directed his employee to notarize the forged signatures); *In re Complaint as to the Conduct of Smith*, 292 Or. 84, 636 P.2d 923 (1981) (attorney disciplinary proceedings in which counsel was suspended for 60 days because he forged client signature on general power of attorney and persuaded his secretary to notarize it, converted client's Pontiac to his own use, and disregarded client's instruction regarding automobile). Kinko's involvement in the notarization of Vancura's forged signature is not analogous to the Arizona bank's purported involvement in the notarization of its customer's forged signature. Kinko's did not affirmatively instruct or urge Albear to act as he did on December 20, 1995. Moreover, the facts do not fit within the scenario suggested by *Commercial Union*, which indicated employer liability should be imposed where the employer was a "party in interest in the transaction," or "participated in [the] breach" by "ask[ing] or encourag[ing] the notary to act without appropriate inquiry." *Commercial Union*, 49 N.J. at 395, 230 A.2d at 501. Kinko's was not a party in interest, did not participate in the transaction, and did not ask or encourage Albear to act as he did that day. Therefore, Kinko's did not actively consent to Albear's official misconduct.

Kinko's argues the trial judge misapplied the model act's "implied consent" provision in this instance because there was no demonstrated pattern prior to December 1995 of improper notarizations which Kinko's failed to correct. The comment to the model act indicates there must be at least one known prior improper notarization before it can be said the notary's employer gave implied consent to the improper notarization before the court. Unless there has been "past action or inaction by the employer concerning a particular improper notarization" (Model Notary Act of 2002, §12—1, Liability of Notary, Surety, and Employer, Comment, at 68-69), the employer has not revealed its attitude toward misconduct and cannot impliedly consent to additional misconduct and the imposition of liability for the harm that results. The record does not indicate Kinko's knew of at least one prior improper notarization before Vancura's forged signature on the as-

signment of mortgage was notarized at the Oak Lawn store on December 20, 1995. We conclude, therefore, that the trial judge's finding of implied consent cannot stand.

For these reasons, we find the evidence does not support the trial judge's finding that Kinko's consented to Albear's misconduct and should therefore be held liable under the Act. 5 ILCS 312/7—102 (West 1996). Accordingly, we vacate the statutory judgments entered against Kinko's in favor of Vancura for $110,000, in favor of Brown for $110,000 and in favor of Katris for $13,000, which were based on the unsupported finding that Kinko's violated the Notary Public Act.

■ Our final consideration is Vancura's cross-appeal regarding his unreimbursed costs for pretrial depositions of his handwriting expert and notary practices expert, and the hourly fees charged by his notary practices expert. In his appellate brief, Vancura also challenges the court's refusal to award the attorney fees he incurred in his successful action, even though the American judicial system does not ordinarily shift fees to the losing party (*McCormick v. McCormick*, 180 Ill. App. 3d 184, 212, 536 N.E.2d 419, 437 (1988)), out of concern that shifting the expenses of litigation acts as a deterrent to the defense or prosecution of an uncertain claim. *Sorenson v. Fio Rito*, 90 Ill. App. 3d 368, 371, 413 N.E.2d 47, 51 (1980). After filing his appellate brief, however, Vancura asked this court for leave to withdraw section II(A) of his brief, which concerned his entitlement to attorney fees. We granted the motion and have disregarded section II(A) of his brief. Vancura's presentation of the remaining issues, however, is unclear and incomplete, and we are unable to resolve the issues on the merits. For instance, he states he incurred $17,016.31 in costs in the "preparation and trial of this case" and was awarded costs of $5,592.25, which "did not fully compensate him." It is unclear from his statements whether the larger amount includes all of the costs he thought were reasonably incurred in this action, or just the costs related to his expert witnesses. He does not specify whether he is seeking the difference between those two figures, $11,421.06, or some other amount after the judge struck certain charges as unreasonable. We could possibly answer this question if Vancura had cited and discussed the specific page or pages of the record on appeal substantiating that he asked the court for all the costs associated with deposing and presenting his expert witnesses. Illinois Supreme Court Rule 341(h)(7) requires an appellant to provide "citation of the authorities and the pages of the record relied upon," as well as reasoned argument. 210 Ill. 2d R. 341(h)(7) (formerly Rule 341(e)(7)). Moreover, the rule states, "Points not argued are waived and shall not be raised in [a] reply brief, in oral argument, or on petition for rehearing." 210 Ill. 2d R. 341(h)(7). See

also *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 562, 851 N.E.2d 866, 870 (2006) (failure to comply with the rules regarding appellate briefs results in waiver). We are under no obligation to search the 21-volume record on appeal in the hopes of finding Vancura's request and the trial judge's reasons for denying it. *In re Estate of Schilling*, 304 Ill. App. 187, 189, 25 N.E.2d 188, 189 (1940) (if questions involved in a case are of sufficient importance to justify this court's resolution, they are worthy of the careful consideration of counsel presenting them). For all we know, the circuit court denied Vancura's request because it was unclear and incomplete. In addition, Vancura states that in this case of first impression, the court "relied heavily" on the notary expert's testimony, but Vancura does not cite the pages of the record that substantiate this characterization. Our own reading of the transcript of the fee hearing discloses the court concluded to the contrary, by indicating that Vancura's handwriting expert was necessary, but his notary practices expert was not. Further, Vancura cites *Miller v. Pollution Control Board*, 267 Ill. App. 3d 160, 172, 642 N.E.2d 475, 485 (1994), and *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 540, 794 N.E.2d 875, 883 (2003), yet he fails to discuss and demonstrate that these cases involved costs which were similar to his own and properly awarded. In fact, the awards in both cases were vacated, so on their face the opinions are not in Vancura's favor. *Miller*, 267 Ill. App. 3d at 172, 642 N.E.2d at 485 (complaining officer was not an expert witness); *DiCosola*, 342 Ill. App. 3d at 540, 794 N.E.2d at 883 (unclear whether expert's deposition transcript was used at trial as a matter of convenience or necessity). We deem the issues waived and affirm the ruling as to costs. *Kindernay*, 366 Ill. App. 3d at 563, 851 N.E.2d 866 at 870.

In summary, in the primary appeal we have affirmed the common law judgments and vacated the statutory judgments and determined the cross-appeal regarding costs was waived.

Affirmed in part and vacated in part.

## PETITION FOR REHEARING

■ In a petition for rehearing, Kinko's argues its statutory and common law duties are identical and that because the statute does not require an employer to train its notary-employees, the court has reached inconsistent conclusions by vacating the statutory judgment while affirming the common law judgment for negligent training and supervision. Although we affirmed the common law judgment due to waiver, we nevertheless reviewed the necessary authority, analyzed the record in light of those principles, and concluded that the manifest

weight of the evidence supported the common law judgment. We note that Kinko's argument for rehearing is unsupported by any authority indicating that a statute which does not speak to notary training was intended by the Illinois legislature to preempt the common law theory of negligent training and supervision. We are not persuaded that the statute at issue limits common law actions and dictated wholesale reversal of the money judgments entered against Kinko's. Kinko's could have reasonably foreseen that negligently training Albear to mistreat his notary seal and settle for an oath and signature exemplar when notarizing documents would proximately cause injury to persons such as the plaintiffs in this action. Accordingly, the petition for rehearing is denied.

J. GORDON, J., concurs.

PRESIDING JUSTICE O'MALLEY, dissenting:

I concur with the majority's holding insofar as it reverses the trial court's finding that Kinko's was liable under the statutory count of plaintiff's complaint (violation of Illinois Notary Public Act (the Act)) because it allegedly "consented" to misconduct on the part of its employee, but I would reverse for a different reason than the one the majority found. After much criticism of Kinko's, the majority concede that the trial court was incorrect to find that Kinko's consented to Albear's misconduct. Their stated reason is essentially that Kinko's could not have consented because it did not know what was going on, this apparently to bolster their theory that Kinko's negligently supervised its employee. In my view, the real reason Kinko's cannot be seen to have consented to misconduct is simple. Defendant, without any obligation to do so, voluntarily trained its notary to do the correct thing pursuant to applicable law and even trained the notary to do several things which were over and above what was required under the Act. It is apparent where an employer goes to the time, trouble, and expense of training an employee, it is seeking to avoid the kind of incident that took place here, not consent to it. It defies logic and common sense to conclude, as the trial court did, that by undertaking to train its employee, Kinko's "consented" to his misconduct; the judgment on count I is therefore properly vacated. I respectfully dissent, however, from the majority opinion with respect to count II—that Kinko's negligently trained and supervised the notary.

The duty to train and the duty to supervise are separate common law causes of action—separate from the statutory count and separate from each other. Kinko's, as stated above, voluntarily undertook to *train*, not supervise, its notary and therefore took on a duty to do so in

a nonnegligent manner (see Restatement (Second) of Torts §324A (1965)), which it did. However, the two common law counts are related to the statutory count in that the common law standard of care is reasonableness, and the statute fixes what a reasonable notary would do under the circumstances. See Illinois Pattern Jury Instructions, Civil, No. 60.00, Introduction, at 233 (2006) (hereinafter IPI Civil (2006) No. 60.00). Consequently, any duty to train is limited to instruction pursuant to the duties that are set out under the Illinois Notary Public Act and/or the two duties that were undertaken. Further, there is no common law duty to supervise unless an employer has notice that there are problems with a particular employee. 30 C.J.S. *Employer—Employee* §205, at 254 (2007). It is undisputed that Kinko's had no such knowledge; it further did not undertake to supervise, so did not acquire a duty to supervise through an undertaking as it did with regard to training.

Moreover, in my view, the entire ruling—not just the first count—should be reversed because the major factors the trial court considered in reaching its conclusion that Kinko's was negligent in training and supervision were inadmissible evidence, not even arguably proximately related to the injury. The ruling is therefore against the manifest weight of the evidence. See *Rybak v. Provenzale*, 181 Ill. App. 3d 884, 897 (1989) (holding that the trial court's damages award was against the manifest weight of the evidence because it was based upon inadmissible evidence). Finally, Kinko's cannot be liable where Albear was not acting within the scope of his employment at the time of this occurrence. Scope of employment is related not only to consent and the statutory count, but to training since it is obvious that an employer could not have a duty to train an employee other than in the performance of his duties as an employee, or to supervise that employee in situations where he was not functioning within the scope of employment. See *Williams v. United States Fidelity & Guaranty Co.*, 854 F.2d 106 (5th Cir. 1988); 30 C.J.S. *Employer—Employee* §205, at 256 (2007) ("Employers do not have a duty to supervise their employees when they are not working ***").

## FACTS

The facts are that Kinko's employed Gustavo Albear and subsequently requested that he become a notary. Although nothing in the Illinois Notary Public Act required it to do so, Kinko's voluntarily trained Albear in his notarial tasks (emphatically demonstrating that no good deed goes unpunished). This training was done by another Kinko's employee, Al Yamnitz, not himself a notary at that time, who studied the Act and Illinois notary handbook (a total of 39 pages) and

384

put together a program. Yamnitz distributed copies of the Illinois Notary Public Act, the Illinois notary handbook, and showed videos. After the session, he "debriefed" the employees, but gave no formal tests.

Albear took the course in July 1995 and proceeded to function as a notary without incident until December of 1995, when this occurrence took place. It seems that two business partners, R. Brown and Boatwright, appeared at Kinko's with two documents, both containing the signature of plaintiff, Vancura. One of them claimed to have obtained the signature from Vancura the night before but Vancura denied that. Boatwright made some necessary copies for the transaction then moved to the counter where Brown and the notary were standing. Boatwright produced a driver's license and another identification to complete "his" part of the transaction. Although Albear admitted at trial that he signed and stamped the first document, what happened next is anybody's guess. Albear acknowledged that the seal on the second document "looked like" his, but denied that the signature on the document was his and this testimony is unrefuted. Vancura, who was undisputedly not present, later sued for damages. Yamnitz testified that he trained Albear to get a photo identification, but the notary testified that he matched signatures to identify signers. It is not clear whether he did this in lieu of, or in addition to, getting a photo identification.

Prior to trial, the defense filed a motion to bar the testimony of plaintiff's expert, Michael Closen, substantially predicated upon the fact that much of it was inadmissible and he was attempting to define the term "satisfactory evidence" which appears in the Act. I disagree that Closen's testimony was, as the majority state, "largely" based on the Illinois Notary Public Act or the handbook for Illinois notaries, as well as the Model Act. Virtually everything he had to say about the Illinois Notary Public Act was not any elucidation of it but, rather, criticisms of its supposed inadequacies. On the other hand, he had high praise for the Model Act and criticized Albear for not meeting its much expanded standards (highly detailed logbook, etc.). In any event, the court allowed Closen to testify, noting that he was aware of his duty to sort out and consider only relevant evidence and would disregard evidence that was inadmissible.

## ANALYSIS

### Duty

With regard to any duty to train and/or supervise in this case, the majority opinion fails to appreciate the inextricable link between the statutory cause of action in the case at bar and the common law causes

of action to train and supervise. I agree with the majority that under the common law, the duty, and thus the standard of care, is one of reasonableness. What is reasonable, in turn, is the conduct specified in the Illinois Notary Public Act. *Noyola v. Board of Education of the City of Chicago*, 179 Ill. 2d 121 (1997). In other words, the duty under the common law count is the same as the duty under the statutory count because it is the statute that fixes the duty and defines what a reasonable person would do under the circumstances. See *Noyola*, 179 Ill. 2d 121; see also *Price v. Hickory Point Bank & Trust*, 362 Ill. App. 3d 1211, 1216-17 (2006); *Workman v. Dinkins*, 442 F. Supp. 2d 543, 555 (N.D. Ill. 2006) (construing various Will County regulations); *Threlkeld v. White Castle Systems, Inc.*, 127 F. Supp. 2d 986, 989 (N.D. Ill. 2001) (construing Illinois law). Although these cases are somewhat different factually, in my view, the principle quoted above is applicable.

Pursuant to the above, the duties which arise under the Illinois Notary Public Act, and thus those under the common law, are simple and straightforward and are much different from those promulgated by the model act. A signature is to be notarized as follows:

"(c) In witnessing or attesting a signature, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person appearing before the notary and named therein.

(d) A notary public has satisfactory evidence that a person is the person whose true signature is on a document if that person:

(1) is personally known to the notary;

(2) is identified upon the oath or affirmation of a credible witness personally known to the notary; or

(3) is identified on the basis of identification documents." 5 ILCS 312/6—102(c), (d) (West 1996).

In terms of a duty Kinko's may have assumed when it trained Albear, the above makes it clear that the Act simply requires "satisfactory evidence" of a person's identity, not any specific document such as a picture identification or any specific number of documents. Further, the Act even allows identification through personal knowledge or an oath of a person known to the notary. Neither the Act nor the explanatory handbook gives instruction on how to dispose of the notary seal, and it was only required that it be kept in a safe place. There is no requirement that a logbook be maintained at all. Kinko's trained Albear pursuant to the Illinois Notary Public Act and the handbook and undertook two additional duties in its training of Albear: one to keep a logbook, the other to get a photo identification.

The majority opinion contains an extensive discussion about the Model Notary Public Act (hereinafter Model Act), claiming that it is

appropriate to look to the Model Act, in this case, to define terms (here, what does "satisfactory evidence" of identification mean under the statute). The Model Act mandates that more than one identification be provided, one of them with a photo, and Professor Closen expressed his view that more than one form of identification is necessary. On the other hand, that is not what the Illinois Notary Public Act or the Illinois handbook advises. The majority discussion leaves the impression that, among other duties, the Model Act requires that two or more pieces of identification are necessary and, impliedly, that Kinko's' trainer was negligent in training Albear to get one photo identification and nothing more unless the latter was suspicious.

However, the Model Act is not the law; it is little more than a series of suggestions that some people would like the law to be. The majority comment that it has never been "formally incorporated into Illinois law." This appears to me to be something of an overstatement. In fact, the legislature has "formally" rejected the Model Act on at least two occasions, with good reason, in my view. For example, the Model Act calls not only for a logbook to be kept but 12 to 13 items of information including a thumb print or retinal scan. This seems to me to be an exaggerated and overreaching requirement. In any event, neither the trial court nor the majority can look to the Model Act to define the duties of a notary. These come only from the Illinois Notary Public Act and Kinko's' own undertaking.

Surprisingly, in spite of this rather lengthy dissertation on the Model Act, the majority in a footnote ultimately decline to answer the question of what "satisfactory evidence" is in Illinois. I would offer the following answer to that question. Professor Closen's view is that two documents are required because the word "documents" is used in the plural. However, Closen's position is wrong, pursuant to the plain language of the statute, and therefore Yamnitz's training to get one photo identification was in compliance with the Illinois Notary Public Act. First, I note, as do the majority, that Professor Closen is an expert, not a court, and it is not his prerogative to interpret a statute. *Department of Corrections v. Illinois Civil Service Comm'n*, 187 Ill. App. 3d 304, 308 (1989) (holding that an expert is not competent to testify as to statutory interpretation). Second, while the appellate majority certainly may interpret a statute, I contend that they would be wrong if they adopted Professor Closen's view. A far more plausible interpretation of this phrase, "on the basis of identification documents" is simply that identification can be ascertained from a variety of different documents that various individuals may present, such as a driver's license, state identification, immigration documents, passport, etc. I also note that the statute must be read as a whole (*In re*

*Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002)) and the term (identification from) "satisfactory evidence," when read in conjunction with "documents," bolsters my conclusion that in Illinois, one or more pieces of evidence may be used to sustain an identification, but there is no requirement that two pieces of identification be proffered. Had the legislature wished to mandate two pieces of identification, it could easily have done so. See, *e.g.*, 5 ILCS 20/7 (West 2006) (providing that proclamation of the adoption of a constitutional amendment shall be made by publication in "at least" two newspapers). Kinko's' trainer therefore correctly trained his charge to get one piece of identification with a photo such as a driver's license.

## Training and Supervision

Kinko's undertook to train, not supervise, its notary and, in my opinion, did so correctly pursuant to applicable law. As previously noted, what a reasonable notary would do is set out in the Illinois Notary Public Act. Albear was trained to get satisfactory evidence (a photo identification), and did keep a logbook with the name, address and information as to what identification, document or documents were presented. Because Kinko's' duty is limited to the extent of its undertaking (see *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992)), where Albear did this, he fulfilled any duty Kinko's undertook in training him with regard to the logbook. Contrary to what the majority appear to believe, there is no duty to keep a bound logbook with voluminous information, audit logbooks, or do anything else with logbooks other than what it undertook to do. The notary also testified at trial that he was trained to have the signer present, although he clearly did not on the day in question; Kinko's therefore trained him correctly and the incident was caused, not by incorrect training, but by his misapprehension of the instruction or collusion in the fraud.

However, one thing which might be considered to be incorrect training is that Albear stated at trial that he was trained to match signatures to ensure proper identification. It is not clear whether he did this instead of getting a photo identification or in addition to it. The fact that Albear did not seem to "get" the training to obtain a photo identification, or at least implied he did not understand this, is not fundamentally linked to Kinko's' training, unless one takes the position, as the majority appear to do, that the mere fact that an employee is trained by a company automatically gives rise to a duty to continuously supervise that employee to insure comprehension and prevent any mistakes. No authority is offered for this proposition.

Further, with regard to supervision, Kinko's had no duty to supervise under the common law, nor did it undertake to do so. 30

C.J.S. *Employer—Employee* §205, at 254 (2007). It is well established that in order to maintain a cause of action for negligent supervision against an employer it must be demonstrated that

"the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, *having this knowledge*, failed to supervise the employee adequately, or take other action to prevent the harm." (Emphasis added.) 30 C.J.S. *Employer—Employee* §205, at 255 (2007).

It is clear from the above that the duty to supervise is only triggered under the common law where the employer had notice of incompetence or misconduct. See 30 C.J.S. *Employer—Employee* §205, at 254 (2007); see also *Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005) ("Thus, where a plaintiff asserts a claim for negligent supervision, the question of whether the employer owes a duty of care to the injured third party boils down to issues of knowledge and causation ***"). It is undisputed that Kinko's had no such information. No duty arose, and consequently, Kinko's cannot be liable under a negligent supervision theory. Further, Kinko's did not undertake to supervise Albear. In fact, the majority opinion castigates Kinko's for what it terms turning a "blind eye" to Albear's activities. Consequently, unlike training, no duty to supervise arises because of an undertaking. See 30 C.J.S. *Employer—Employee* §205, at 255 (2007) ("The tort of negligent supervision is separate from those of negligent hiring and retention"); *Lowe v. Surpas Resource Corp.*, 253 F. Supp. 2d 1209, 1245 (2003); but *cf. Allen v. Posternock*, 107 Pa. Super. 332, 335, 163 A. 336, 336 (1932) (holding that the employer had a duty to ensure her instructions not to smoke were obeyed because, *inter alia*, she had knowledge the employee was not obeying her instructions).

Even if a duty to supervise did somehow exist, the scope of that duty the majority seek to impose is much too broad. As a practical matter, to prevent any mistake or criminal behavior or "harm to the public" (as the trial court said), Kinko's would need supervisors for the supervisors and so on and so on. I believe this would put an unsupportable burden on defendant and violate one of the tenets for imposition of a duty. *Sollami v. Eaton*, 201 Ill. 2d 1, 17 (2002) (holding that, "[i]n determining whether a duty exists, a court should consider the following factors: (1) the reasonable foreseeability of injury, (2) the reasonable likelihood of injury, (3) *the magnitude of the burden that guarding against injury places on the defendant, and* (4) *the consequences of placing that burden on the defendant*" (emphasis added)). Could the Secretary of State be sued for negligent supervision if an individual, having been provided with and tested on the Rules of the Road, either did not understand or comply with them and had an ac-

cident? That scope would be much too broad and impossible for the Secretary to abide by. Further, no amount of supervision would prevent criminal behavior on Albear's part, if that is what occurred.

In short, there is no duty that an employer supervise an employee absent notice of problems, and even if a duty to supervise could be considered to have arisen from mere training, it is not nearly as broad as the majority opinion suggests. We do not even know what happened in the few moments that the documents were notarized. Adopting the majority view would make Kinko's the absolute insurer for every mishap on its premises involving an employee. In my view, this is much more than the law contemplates. See *Hartung v. Maple Investment & Development Corp.*, 243 Ill. App. 3d 811, 815-16 (1993) ("an owner or occupier of land is not an absolute insurer of the safety of an invitee"). Moreover, as a matter of public policy, an affirmance would discourage employers from offering training.

## Manifest Weight

The majority's entire case for negligent training hangs on their acceptance of the trial judge's conclusion that Kinko's did not properly train Albear to get a photo identification and that this ruling is not against the manifest weight of the evidence. According to the opinion, this implies that the trial judge must have believed that the trainer was lying when he said he trained Albear to do this and Albear was telling the truth when he testified at trial that he was trained to match signatures. The majority further hold that we must accept this as correct because the trial court is in a better position to judge credibility. *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006). I acknowledge that this is generally the law, but in this case, I disagree. Historically, the court has noted that even in a bench trial an error can be made as to the findings of fact and it is the duty of the appellate court to weigh the evidence. *Talmage v. Union Central Life Insurance Co.*, 315 Ill. App. 623, 642 (1942). More recently, this court has observed in the context of the manifest weight of the evidence standard, "[r]eview in the appellate court is not perfunctory, however, and the fact that we give deference to the trial court's conclusions of fact does not preclude overturning the trial court's decision when the evidence so requires." *Midwest Software, Ltd. v. Willie Washer Manufacturing Co.*, 258 Ill. App. 3d 1029, 1051 (1994). I submit that in the case at bar, where the trial judge got at least four out of five things wrong and based her decision on much irrelevant evidence (as will be discussed below), we are not required to agree that she was right in her assessment of this single credibility issue.

A ruling is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Wojcik v. City of Chicago*, 299 Ill. App. 3d 964, 981 (1998). A more functional test to evaluate whether a decision is against the manifest weight of the evidence is provided by Justice Quinn in *Kresin v. Sears, Roebuck & Co.*, 316 Ill. App. 3d 433, 441 (2000). *Kresin* instructs that the inquiry on appeal is not whether other conclusions are possible. Rather, the inquiry is whether the result reached is reasonable. *Kresin*, 316 Ill. App. 3d at 441. In my view, a review of the evidence shows that the court's conclusion is not reasonable. First, common sense dictates that Albear, who either made a big mistake or was colluding with the perpetrators of this fraud, appears to have every reason to lie about how he was trained in order to deflect blame onto Kinko's. The trainer, Yamnitz, on the other hand, had no apparent reason to lie. Secondly, Albear was undisputably given the Illinois notary handbook and was lectured on its contents during training. The handbook is as clear as a bell about the need for a photo identification and to have the signer present. Next, he was "debriefed" on these lectures, which I take to be a check on his knowledge. Finally, Albear acknowledged at trial that he was trained to have the signer present. For these reasons, the evidence does not support the trial court's conclusion that Albear was the more credible witness. Therefore, the reasonable conclusion is that Kinko's in fact *did* train Albear correctly and the trainer, not Albear, was telling the truth. In my opinion, the trial court's conclusion on the credibility issue is against the manifest weight of the evidence.

Further, wholly contrary to the evidence, the court seemed to assume that Albear did not get a photo identification on the day in question because Kinko's didn't train him to do it, resulting in this fraud. However, the record shows that, as to the one document Albear acknowledged that he notarized, Albear actually *did* get a picture identification that day as well as some other identification. Even if he did not ask for it and it was voluntarily produced, where he had a picture identification it does not matter whether he asked for it or not—the purpose of his training was fulfilled, so as to this first document there is no proximate relationship between his professed misunderstanding of his training and the fraud on plaintiff. The court appears to have completely forgotten or discounted this testimony in its ruling, although it was puzzlingly willing to accept Albear's testimony over that of the trainer about the photo identification.

What happened with the second document—where Albear claims the seal "looks like" his but the signature was definitely not his—is not just "unclear," as the majority state, it is unknown. While it is not unreasonable to infer that, if he asked Boatwright for a picture

identification then he would have also asked Brown several seconds later, we do not really know what happened with the second document and can only resort to impermissible speculation, *i.e.*, that Albear's conduct was a proximate cause of the injury. Mere speculation, however, is insufficient to establish proximate cause as to this particular thing or, for that matter, to the entire cause of action. *Castro v. Brown's Chicken & Pasta, Inc.*, 314 Ill. App. 3d 542, 553 (2000) ("The element of proximate cause must be established to a reasonable certainty, and no finding can be based upon mere speculation").

To indulge briefly in such speculation, we might query whether Albear was given false identification showing the bearer to be Vancura—we do not have enough facts to know if, under that circumstance, a reasonable person should have accepted that person as Vancura—similar physical features, age, etc. Another "nonnegligent" scenario is that Albear momentarily left his seal on the counter and turned to answer a customer question or a phone call and one of the partners surreptitiously stamped the second document, later signing Albear's name. The latter would not rise to the level of negligence, in my view, since a reasonable person might well have done the same. IPI Civil (2006) No. 10.01. Of course, if Albear was colluding with Brown and Boatwright to defraud Vancura, all the pictures and identification in the world would not have prevented the fraud. Where Albear got a signature on the day in question, the only real evidence of Kinko's negligence the majority have, then, is that although Albear was properly trained to have the signer present, he did not do it. It is hard to view this as a negligent, and not deliberate, act. How can you negligently not notice that the signer is not present? He either is, or isn't. If it was criminal conduct on Albear's part, I do not believe Kinko's is liable. See *Doe v. Big Brothers Big Sisters of America*, 359 Ill. App. 3d 684, 700 (2005) (generally noting that a person is not liable for harm to another that results from the person's failure to defend the other against a third party's criminal attack).

As previously stated, I believe that the trial judge was wrong on virtually everything. In addition to credibility, her decision on consent was also wrong, as evidenced by the majority's *vacatur* of that ruling. Further, with regard to the portion of her order finding Kinko's liable for negligent training and supervision, the trial court accepted Professor Closen's testimony regarding nearly every issue and shaped her ruling accordingly, although much of his testimony was inadmissible. See *In re Kenneth D.*, 364 Ill. App. 3d 797, 803 (2006) (recognizing that "[a]ll evidence must be relevant to be admissible"). The judge early on stated that she was well aware of her duty to consider only relevant testimony and would do so. However, even a cursory examina-

tion of her ruling makes it clear that she considered substantial evidence which was inadmissible because most of the alleged negligent acts upon which her ruling was based were not proximately related to this event.

An act or omission is not regarded to be a cause in fact of an event if the event would have occurred without it. *Stojkovich v. Monadnock Building*, 281 Ill. App. 3d 733, 738 (1996). Put another way, the act or omission is said to be a cause in fact of the event if it was a material element and a substantial factor in bringing the event about. See *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). It is not enough for plaintiff to show that Kinko's might be somehow generally negligent—the negligence alleged must actually have caused the injury complained of. See *Lee*, 152 Ill. 2d at 455 (holding that cause-in-fact, *inter alia*, must be shown to establish proximate cause). For example, if there were a large greasy spot at Kinko's' entrance or doorway and employees and managers ignored it for a week, one might consider that to be a generally negligent condition, but unless someone fell or was injured by the condition, it would not be actionable.

The trial court's ruling is premised upon approximately five things, four of which potentially could be considered negligent but which are not proximately related to this injury. Relying on Closen's irrelevant testimony, the trial court held that Albear, because of Kinko's' training program, was negligent in his choice of a logbook, its entries, and where he kept his logbook and seal. These factors featured prominently in her ruling. The majority note (391 Ill. App. 3d at 367) that the trial court stated:

" '[The notary instructor] did not teach them that information regarding notarizations was to be kept in a [bound] journal, did not teach them about steps to take to secure the notary seals and journal, and did not instruct Kinko's notaries on the need to preserve the notary seal and logbook.' "

And:

" '*** Albear did not require photo identification from a document signer. He did not properly secure his notary seal and he did not properly keep [the] notary journal [Kinko's instructed him to keep]. Also, Closen testified that when Albear left the employ of Kinko's, he left his seal and journal behind with no assurance that the seal would not be misused or that his logbook would not be lost or destroyed.' "

Albear's book had spiral bindings and pages that could be ripped out without detection, supposedly had "insufficient" information (according to Professor Closen), and was not kept in a continuously locked place, which the majority implies is synonymous with "safe." In addi-

tion, it was left at Kinko's when Albear left and was lost at the time of trial 13 years later.

Where there is no evidence that the fraud on Vancura was caused by a missing entry page, lack of information, or a book or seal that was lost or stolen from an open drawer and somehow used to cause this event, nothing about the logbook Albear kept has anything to do with this occurrence. See *Castro*, 314 Ill. App. 3d at 553. The event would have happened if the logbook were carved on stone tablets, kept in a vault with armed guards, and contained every bit of information, womb to tomb, about the signer. Consequently, these factors are irrelevant in determining Kinko's' liability for negligent training. Where Albear routinely kept his seal is also irrelevant because the seal obviously had to be out and available for this event to have occurred at all and what he did with it otherwise does not matter. To the extent the trial judge considered these things in her ruling, it is incorrect. The majority opinion incorporates these factors and further finds that Kinko's was negligent in that it failed to "audit" Albear's logbook. I have no idea where a duty to audit logbooks would come from and no authority is offered to say one exists. No such thing is mentioned in the Illinois Notary Public Act, the handbook, or even in the Model Act. Since it is the Illinois Notary Public Act which defines what is reasonable for a notary to do and auditing is not included, I believe it is incorrect to maintain that Kinko's is liable for breach of a nonexistent duty. Further, Kinko's' duty pursuant to the undertaking is limited to the extent of that undertaking, and Albear did keep a logbook with the three items of information Kinko's taught him to keep. The majority opinion impermissibly expands the required duty when it includes "auditing" logbooks or keeping bound logbooks.

The majority also hold that Kinko's' training was negligent because Kinko's "accepted" the seal and logbook when Albear departed. Again, even if this conduct could be considered generally negligent, it had nothing to do with bringing about this injury. Albear could have left his seal at a movie theater when he departed, but absent evidence it was used by a third party to defraud Vancura on the day in question, it is totally irrelevant to the ultimate outcome. Where this court relied on substantial evidence that it should have recognized as irrelevant or inadmissible and the majority incorporated it in their opinion, I think both are incorrect.

The trial court and the majority further claim that Kinko's was negligent in its training by having a non-notary create and teach the notary program. First I would point out that the Illinois Notary Public Act and handbook are simple and straightforward and a person of normal intelligence should easily be able to understand them absent

any training. However, Kinko's did undertake to train its notary and a reading of the Act, videos, and "debriefings," which I take to be a review of the material, is, in my view, more than sufficient training. I question what additional things a notary would have brought to the table. Further, there is no authority that stands for the proposition that use of anything other than a notary-teacher is a deviation from the standard of care or violation of a duty under the common law theory, even where there is an undertaking. Notably, none is offered by the lower court or the majority. If a lawyer or someone with an MBA taught the course, would that be negligent in and of itself?

More importantly, the trainer *did* offer the correct training (get a photo identification, have the signer present, keep a logbook, etc.). The fact that he was not a notary is not therefore proximately related to plaintiff's injury. Aside from getting a photo identification, as previously discussed, the majority have not pointed out what was inadequate about the training except the general conclusion that the trainer was "not familiar with sound notarial practices." The only thing the trainer was admittedly unfamiliar with was the Model Act, but that is completely irrelevant. He was familiar with the Illinois Notary Public Act and handbook, and that is the only law which applies, to both the statutory and the common law counts.

In short, the substance of the trial court's ruling is against the manifest weight of the evidence in that it consisted mainly of conclusions predicated on inadmissible evidence. In addition, with regard to the all-important issue of credibility, it is a perfectly reasonable principle that the trial court should be correct about witness credibility because he or she is present. See *Best*, 223 Ill. 2d at 350-51. In this case, however, where the decision is wrong on everything else, this theory is little more than a legal fiction. In my view, affirmance of the trial court here leaves an entity that had virtually nothing to do with the injury potentially liable for the whole verdict, and the real perpetrators of the fraud possibly off the hook. This result is unjust, in my view.

## Waiver

The majority find that Kinko's has waived any argument regarding negligent supervision because essentially they find the cases defendant cites essentially to be not on point (going to hiring and retention) and unpersuasive. Where the party has offered authority, but the court is ultimately unpersuaded by the cases for whatever reason, in my view, waiver is much too harsh a result. See *Welch v. Johnson*, 147 Ill. 2d 40, 48 (1992) (holding that a reviewing court may, "in furtherance of its responsibility to [provide] a just result, override

considerations of waiver"). I think waiver is more appropriately applied where a party has offered no authority whatever, or ones which are not even tangentially related to the issues. Finally, even if it were correct to find waiver, it is a limitation on the parties, not on this court. See *Welch*, 147 Ill. 2d at 48.

## Scope of Employment

Kinko's argued on appeal that it could not be liable through Albear because he was not acting within the scope of his employment at the time. The Restatement of Agency (Second), in effect at the time, states:

> "(1) Conduct of a servant is within the scope of employment if, but only if:
>> (a) it is of the kind he is employed to perform;
>> (b) it occurs substantially within the authorized time and space limits;
>> (c) it is actuated, at least in part, by a purpose to serve the master ***[.]
>> ***
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." Restatement (Second) of Agency §228, at 504 (1958).

The majority apply the Restatement (Third) of 2001 for some reason, although the Restatement (Second) was the guideline in 1995 when this event occurred and the Illinois Supreme Court quoted extensively from the Restatement (Second) recently in a somewhat similar case. See generally *Bagent*, 224 Ill. 2d at 164-71. While training and supervision are separate causes of action, it is clear that Kinko's could have no duty to train or supervise an employee in anything but his role as an employee. See *Williams v. United States Fidelity & Guaranty Co.*, 854 F.2d 106 (5th Cir. 1988); 30 C.J.S. *Employer—Employee* §205, at 257 (2007) ("Employers do not have a duty to supervise their employees when they are not working ***").

I was initially inclined to think the majority were correct to find Albear within the scope because he was attending to notarial duties when the incident occurred. However, a close reading of *Commercial Union Insurance Co. of New York v. Burt Thomas-Aitken Construction Co.*, 49 N.J. 389, 230 A.2d 498 (1967), persuaded me otherwise. *Commercial Union* is very similar factually to the case at bar. While it is a New Jersey Supreme Court case, in our case of first impression it is appropriate to look to other jurisdictions for guidance. *Owens v. Department of Human Rights*, 356 Ill. App. 3d 46, 54 (2005). Notably, while this case is somewhat different in that Kinko's solicited Albear

to become a notary and trained him, these facts make the holding in *Commercial Union* no less applicable.

In *Commercial Union*, a bank employee (a notary) acknowledged a signature that was later claimed to be a forgery and the injured party sued the Bank. The court held that the bank was not liable for two reasons: first, the court noted that a notary public is a public official empowered by the state, not the bank, and as such exercises a power the bank does not possess; the notary is thus not performing the Bank's work. *Commercial Union*, 49 N.J. at 394, 230 A.2d at 500. The second reason is that there was no evidence that anyone was relying on the bank and/or its reputation in choosing this particular notary. *Commercial Union*, 49 N.J. at 394, 230 A.2d at 500.

In the case at bar, training or no training, Albear only became a notary through the power of the state, not Kinko's. Further, Kinko's could not perform the notary function and the fact that the service may have benefitted Kinko's by conveniencing its customers is insufficient reason to hold Kinko's liable. See *Commercial Union*, 49 N.J. at 394, 230 A.2d at 500. Finally, there is no evidence whatsoever that the partners specifically relied upon Kinko's' reputation and sought out only a Kinko's notary. Common experience makes it likely that they simply wanted any notary.

Significant to our case, the *Commercial Union* court stated:

> "Thus the notary public exercises a power he receives from government rather than from someone who happens to be his private employer. The bank could not itself take an official acknowledgment or empower an employee to do so.
>
> * * *
>
> We are not persuaded that justice would be served by imposing liability in these circumstances. Surely neither party anticipated that prospect, and hence to deny liability cannot surprise or disappoint anyone. No doubt a private employer, here a bank, may gather goodwill through the presence of a notary public and may have that advantage in mind when it encourages its employee to seek the office, but it is also true the public convenience is furthered when the services of a notary public are thus made available. We see no good reason to hold a private employer who was in no sense a party in interest in the transaction when the claimant did not look to the employer and sought nothing more than an acknowledgment before some notary public." (Emphasis omitted.) *Commercial Union*, 49 N.J. at 393-95, 230 A.2d at 499-501.

In the case at bar, Albear was performing his own work—that of a notary—a task Kinko's could not do. He was thus not doing Kinko's' work, giving rise to a *respondeat superior* situation. *Commercial Union*, 49 N.J. at 393-95, 230 A.2d at 499-501. There is also no evidence that

any of these parties specifically relied upon a notary from Kinko's, as opposed to any other notary, so Kinko's should not be liable.

Further, in balancing the equities, as the *Commercial Union* court did, plaintiff has already received full compensation from the businessmen who actually perpetrated this fraud and a windfall of $30,000 from Albear. He should not be allowed an even larger windfall by holding Kinko's liable. In terms of joint and several liability, it would be unjust to force Kinko's to pay the entire sum where it had nothing to do with the fraud.

In summary, in my view Kinko's undertook to train Albear and did so in a nonnegligent manner. He was trained to follow the proper procedures but either failed to comprehend or deliberately did not do the right thing for his own purposes, and it is possible he colluded with the partners who actually defrauded plaintiff. Moreover, on the subject of training, the trial judge got virtually everything in the ruling wrong, so I decline to embrace the notion that she was correct in ruling the Kinko's trainer was lying when he said he trained Albear properly. Further, where the trial court and the majority consider clearly inadmissible evidence—evidence that is unrelated proximately to the injury—the trial court's ruling is against the manifest weight of the evidence and the majority's opinion is, in my view, incorrect.

Accordingly, I respectfully dissent.